**MORRIS MECHANICAL ENTERPRISES, INC.**

v.

**The UNITED STATES.**

No. 508–80C.

United States Claims Court.

Nov. 17, 1982.

H. Robert Ronick, Atlanta, Ga., attorney of record for plaintiff. Janet F. Perlman, Katz, Paller & Land, Atlanta, Ga., of counsel.

---

Frank M. Rapoport, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

### Statement of Facts

SPECTOR, Judge:

This is a contract case arising out of a project for the development of a Federal Law Enforcement Training Center on an old military base at Glynco, Georgia. The project was administered by the General Services Administration (GSA). Instead of awarding a single prime contract for construction of the project, with the various aspects of the work then being performed by subcontractors coordinated by and working under that prime contractor, GSA elected to award a multiplicity of prime contracts for the various segments of the work.[1] Still another prime contract was awarded to Lasker-Goldman Corporation to act as construction manager.

Plaintiff is a small mechanical contractor specializing in heating and air conditioning systems, which it has installed in settings ranging from family homes to major military installations. Government contracts account for about 70% of its business and it has successfully performed several of these at prices ranging from $100,000 to about $1 million. On this project, plaintiff was one of that multiplicity of prime contractors. Its sole obligation was to buy and deliver to the project site a 650-ton centrifugal chiller,[2] which was then to be installed by another prime contractor.

Ordinarily the Government or its general prime contractor for the entire project would purchase the chiller directly from one of the major air conditioning manufacturers, which would bid to and contract directly with the Government, or that general prime contractor. In this instance, however, plaintiff was the "beneficiary" of GSA's small-business set-aside program. It was awarded a prime contract covering just the purchase of the chiller, as a means of satisfying the agency's small business set-aside requirements. As a result, one of the major manufacturers of air conditioning equipment was destined to become a bidder to, and subcontractor under, a small business entity.[3] This effectively eliminated bids that large chiller manufacturers would ordinarily have submitted directly to defendant.

Defendant issued a pre-invitation notice for purchase of the chiller on November 16, 1977, and plaintiff Morris picked it up in a commercial periodical. The notice indicated an estimated cost of $25,000 to $100,000, well within Mr. Morris' experience, so he sent for the invitation and contacted three major manufacturers, Carrier, York, and Airtemp. Plaintiff was initially most impressed with the York chiller because it best fit the contract requirements and was in fact the only chiller which would exactly satisfy the length and width requirements.[4] But York refused to set a firm delivery date, an important factor since the proposed contract required delivery within 120 days of receipt of a notice to proceed from defendant. Carrier also refused to set a firm delivery date, and in addition refused to perform certain factory tests required by the proposed contract. In addition, the Carrier chiller was far too large to meet the limited space requirements.[5] That left Airtemp as the only manufacturer willing to

1. The testimony indicates that there were from 35 to 57 separate prime contractors on the site.

2. A chiller cools a quantity of water and circulates it through coils over which air is blown and chilled, and then circulated to areas to be cooled.

3. Plaintiff was founded in 1977 by Jerry Morris. A small business is an independently owned and operated firm which is not dominant in the area in which bids are being invited, and which has average annual receipts of less than $12 million in the 3 years preceding its bid. Plaintiff qualified under these criteria.

4. The chiller was to be placed in a building corridor adjacent to an existing 440-ton chiller already in operation, so they could supplement one another.

5. As testified by Lasker-Goldman's (the construction manager) representative on the site.

schedule a firm delivery date and to perform the necessary factory tests.[6]

Defendant issued its Invitation for Bids on December 16, 1977 and plaintiff submitted its responsive bid in the amount of $78,763 on February 23, 1978. Six other bids ranging in amount from $93,970 to $165,800 were received.[7] The 120-day (17 weeks) delivery requirement was extremely tight. Evidence of record shows that it ordinarily takes 16 to 26 weeks to produce and deliver such a piece of equipment. Unknown to plaintiff, defendant's construction manager, Lasker-Goldman, had in fact informed defendant based on its own investigations of six major manufacturers[8] that the requisite chiller could not be produced and delivered in less than 19 to 20 weeks.

By late February 1978, plaintiff's efforts had necessarily focused on Airtemp, a reputable subsidiary of Chrysler Corporation, which had produced chillers for many years. He talked with Charles D. Woodward, a manufacturer's representative for Airtemp and for other mechanical equipment manufacturers in the Atlanta area.[9] Woodward was authorized to quote on equipment, subject to Airtemp's acceptance. Since he had no authority to bind Airtemp to a contract, plaintiff asked him to obtain a specific delivery date. In a letter dated March 1, 1978, Woodward replied:

> Airtemp has indicated that they can ship this machine by July 10, 1978, based on a tentative order this week. Assuming we can delay the starting date for the Government schedule with submittal and bonding procedures, we should have no problem meeting the 120 day specified schedule.

6. Its chiller was also less expensive than the others.

7. Lasker-Goldman's representative explained these much higher bids as reflecting foreseeable delays, and the need for a bidder to include contingencies in its bid to cover liquidated damages which might be assessed.

8. Including the three contacted by plaintiff.

9. Woodward is an independent businessman, and a registered professional engineer in Georgia.

He further promised that "[i]n the event that production delays occur, and we are unable to obtain an extension of the government schedule," he would be willing to reimburse plaintiff for half its liquidated damages, up to a total of $2000. This promise reflected Woodward's confidence, based on assurances from Airtemp, that the chiller would be delivered on time.[10] He testified that in accordance with standard industry practice he considered July 10, 1978 to be a firm delivery date and that he was so assured by Airtemp. Soon after he received Woodward's letter, plaintiff spoke with Airtemp's national sales manager and received assurances that the Airtemp chiller would be delivered by July 10, 1978. Under these circumstances it was reasonable for plaintiff to assume that the July 10, 1978, delivery date was firm.

On March 3, 1978, plaintiff issued a purchase order for a 650-ton chiller to Airtemp "[s]ubject to and in full accordance with the attached job specifications." The purchase order plainly stated that the "[c]hiller must be shipped on or about July 10, 1978." In an Airtemp order form dated March 6, 1978, Woodward submitted plaintiff's order to Airtemp. It will be noted that this preceded by almost a month the award of a contract to plaintiff by defendant. Plaintiff knew it was the low bidder, and wanted to place its order as early as possible in order to insure timely delivery. Also in an effort to save time, on March 6, 1978, plaintiff submitted to GSA certain relevant information about the chiller it would buy.[11]

The contract was awarded to plaintiff on March 29, 1978. On April 18, 1978 plaintiff

10. His letter to plaintiff stated: "Airtemp management is confident that they can meet this schedule. If you would like to discuss it with them directly, the national sales manager is Ted Lembeck and his office is in Edison (New Jersey)."

11. This submission was originally rejected (March 16, 1978) as "too big for the available space." Later (June 1978) after explanations as to the chiller's design, the submittal was accepted.

**436**

received its notice to proceed which started the running of the 120-day delivery schedule, thereby fixing the delivery date of August 18, 1978.

The issues in this case are governed by Clause 5, "General Provisions," providing in relevant part as follows:

(a) * * * Whether or not the Contractor's right to proceed with the work is terminated, he and his sureties *shall be liable for any damages to the Government resulting from his refusal or failure to complete the work within the specified time.*

\* \* \* \* \* \*

(c) *If fixed and agreed liquidated damages are provided in the contract* and if the Government does not so terminate the Contractor's right to proceed, *the resulting damage will consist of such liquidated damages until the work is completed or accepted.*

(d) The Contractor's right to proceed shall not be so terminated *nor the Contractor charged with resulting damage if:*

(1) The *delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor,* including but not restricted to, acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another Contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather *or delays of subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers;* and

(2) The Contractor, within 10 days from the beginning of any such delay (unless the Contracting Officer grants a further period of time before the date of final payment under the contract) notifies the Contracting Officer in writing of the causes of delay.

\* \* \* \* \* \*

(g) As used in Paragraph (d)(1) of this clause, *the term "subcontractors or suppliers" means subcontractors or suppliers at any tier.* [Emphasis supplied.]

Special condition 4.6 provided for payment of liquidated damages to defendant if plaintiff failed to complete its contractual obligations within the time specified in the contract, or as extended. Supplemental special condition 7.1 fixed liquidated damages at $100 per day of delay.

Around April 1978, plaintiff learned for the first time that Airtemp would apparently be unable to ship before August 15, 1978. In letter dated April 17, 1978, plaintiff advised Airtemp's national sales manager that Woodward had promised a firm delivery date of August 15, 1978 and he asked for confirmation of that date, reiterating his concern that the chiller be delivered in time for plaintiff to meet its delivery date. Plaintiff then wrote Woodward on the day following his receipt of the notice, to proceed, urging that the chiller be delivered on the site by August 17, 1978.

On May 1, 1978, Airtemp's national sales manager (Lembeck) confirmed in writing that the Airtemp chiller was scheduled for delivery no later than August 15.[12] But on May 1, 1978, plaintiff learned that the delivery date had apparently slipped once again. Based on repeated assurances he had received from Airtemp officials in New Jersey, Woodward had written plaintiff on June 30, assuring him the chiller would be delivered by September 30, 1978.

It will be recalled that plaintiff was first to buy and deliver the chiller. It then was then to be installed under another prime contract which had been awarded to Ivey's Plumbing and Electrical Co., Inc.[13] Following that, plaintiff was to provide necessary start-up services. Ivey's Plumbing received

**12.** He added: "I know this date is later than anticipated and wish to advise that we will do everything possible to hold and improve if possible the August 15th schedule."

**13.** Ivey's Plumbing was also to install an underground water system and related work.

its notice to proceed on July 10, 1978, and had 357 days (or until July 2, 1979) to complete its work.

On August 16, 1978, Airtemp's regional manager informed plaintiff that the chiller had been "rescheduled to ship October 31, 1978 due to vender [sic] supply parts and delays in our production line caused by movement of the Airtemp manufacturing facility." The latter referred to the relocation of its Bowling Green, Kentucky, facilities to Edison, New Jersey, in response to an unresolved labor strike which had begun about 10 months before plaintiff placed its order. Plaintiff had not then been made aware of the strike by Woodward or any other Airtemp representative.

Airtemp's Mr. Lembeck wrote Woodward on August 12, 1978, claiming that the chiller motor had been damaged in shipment, that it was being returned to the manufacturer for inspection, and that this might affect the delivery of the chiller. This information was passed along to plaintiff.[14]

By the late summer or early fall of 1978, plaintiff became concerned about Airtemp's reliability and recontacted Carrier and York. As they had done earlier, these manufacturers declined to set a firm delivery date. And Carrier reiterated its refusal to perform factory tests required by the contract. Plaintiff became resigned to the fact that Airtemp remained its best hope for receiving a chiller in the shortest possible time.

In September 1978, plaintiff heard from Lasker-Goldman's Mr. Norton regarding the slippages in delivery date. According to plaintiff, Norton indicated that GSA probably could live with a September 15 but not a September 30 delivery date. Plaintiff in turn wrote Woodward reminding him that it was "imperative that we deliver the chiller at the earliest possible date." In early October 1978, Woodward travelled to the Airtemp factory in New Jersey and was assured by officials there that they would meet their most recent commitments, but plaintiff having received a report that delivery would not be made until December 8, 1978, wired an Airtemp vice-president, and emphasized the need for prompt delivery.

A chiller such as this is not manufactured 100% in-house but rather certain components are supplied by other manufacturers. In this case Airtemp was producing the chiller's compressor, but was relying on other manufacturers for the chiller's shell, tube heat exchangers, and motor. At this point, Airtemp began blaming some of its problems on its suppliers.[15] In an October 3, 1978 letter to plaintiff, Airtemp indicated that one of its suppliers had failed to supply the shell and tube heat exchangers on time, and that the move to New Jersey had resulted in difficulty in locating some suppliers and in starting up assembly lines.

By letter dated October 6, 1978, plaintiff asked GSA for an extension of time. It supported the request with a review of its dealings with Airtemp, indicating that the delay was unforeseeable on plaintiff's part and beyond its control and without its fault or negligence. Defendant replied by asking for more information.[16]

Airtemp sought to provide plaintiff with information supporting the latter's request for a time extension in a letter of November 17, 1978 describing its strike at Bowling Green, and the delays of a supplier, Process Engineering Machine Co. (Pemco). However, it prefaced those comments with this discouraging remark:

> First of all, it is our position that we never agreed to an unconditional or fixed delivery date. Secondly, we never accepted and do not accept any responsibility for consequential or incidental damages.

---

14. It later appeared on the occasion of a visit by plaintiff to the Airtemp factory in New Jersey that the motor was not in fact damaged, although it may have been returned for repair.

15. See note 14, *supra.*

16. Although it was Lasker-Goldman's responsibility to coordinate the work of all the other prime contractors on the site, GSA had retained sole authority to grant extensions of time and to approve changes involving additional compensation.

Finally in December 1978, plaintiff and Woodward together visited the Airtemp factory in New Jersey. They found it was still experiencing delays, now attributed to Pemco, a supplier.

At this time, plaintiff asked GSA to intercede with Airtemp to expedite delivery of the chiller. It is customary for Government employees to assist in this way and expediters and priority systems are often employed in this way. Strangely, GSA refused to play any part in the matter, claiming that its "standards of conduct" prohibited it from assisting in expediting delivery. It was apparently referring to an unrelated Section 105–735.201(b)(2) of its Standards of Conduct which prohibits GSA personnel from taking any action which might result in or create the appearance of "[g]iving preferential treatment to any person." [17]

Plaintiff also asked Lasker-Goldman, GSA's contract manager, for expediting assistance with Airtemp, and Lasker-Goldman did contact Airtemp, but with no apparent success. In January and February 1979, plaintiff was informed by Airtemp that delivery had slipped to late February and then to mid-March; and it was warned by Lasker-Goldman that the delay was "seriously affecting the completion of several projects" and that plaintiff could expect the assessment of liquidated damages. Plaintiff wired Airtemp again complaining of the delay and insisting on prompt delivery.[18]

Meanwhile, plaintiff's October 6, 1978 request to GSA for an extension of time had languished. Defendant declined to act on it even after a discussion between GSA, Woodward and plaintiff on April 13, 1979.[19] Defendant wanted more information on the Bowling Green strike, Airtemp's attempts to minimize the impact of its move, and Airtemp's efforts to remedy its problems. This information was under the control of Airtemp which was now refusing to release any information to plaintiff.

Delivery of the chiller to the site was accomplished on April 7, 1979. This was 231 days after the scheduled delivery date of August 18, 1978. This completed plaintiff's purchase and delivery obligation, but not "start-up" services to be performed after the chiller had been installed by another prime contractor, Ivey's Plumbing.

However, the chiller was not immediately moved into the building where it was to function, because a dispute arose as to whether or not its condenser heads were properly located. Ivey's Plumbing refused to reverse the heads, a comparatively simple task taking a few hours, and it furthermore refused to install the chiller until the heads were reversed. According to plaintiff and Woodward, the heads were located where they had been shown on plaintiff's approved submittals (or were not previously required to be detailed) and hence not subject to later objection. Lasker-Goldman's Mr. Norton was unwilling to assign blame for the need to reverse the condenser heads. GSA sided with Ivey's Plumbing. Neither GSA nor Lasker-Goldman resolved this minor problem for several months. There was another minor problem arising out of the need for an electrical disconnect switch (not previously mentioned) and Lasker-Goldman and defendant agreed that Ivey's Plumbing should provide this and be reimbursed.

There were other far more serious problems delaying installation by Ivey's Plumb-

---

**17.** It should be noted that GSA was very sensitive to on-going investigations of the agency at this time.

**18.** It should be emphasized that plaintiff's expediting efforts were not confined to the letters, wires and visits to Airtemp cited in the text. Plaintiff was also in constant touch with Airtemp by telephone, and also kept in close touch with GSA and Lasker-Goldman concerning the delays.

**19.** The earlier partially-quoted Clause 5 "General Provisions" further provides at (d)(2) that:

"The Contracting Officer *shall ascertain the facts and the extent of the delay* and extend the time for completing the work when, in his judgment, the findings of fact justify such an extension, and his findings of fact shall be final and conclusive on the parties, subject only to appeal as provided in Clause 6 of these General Provisions." (Emphasis supplied).

ing. These were in no way related to plaintiff's contract nor attributable to plaintiff. The equipment room in which the chiller was to be installed had not been completed when the chiller arrived. Moreover, all connections and locations of items had not been worked out. Structural problems in the room, particularly in the ceiling, had to be accommodated, resulting in at least one "stop order" by GSA lasting from March 1, until May 14, 1979.

Another problem unrelated to plaintiff's performance arose when workers discovered that unknown, subsurface underground obstructions on this old military site would interfere with the construction of this project. Lasker-Goldman's representative testified that these problems were entirely beyond plaintiff's control, and would have delayed installation of the chiller even had it been delivered by plaintiff as scheduled. He further testified that part of the problem was GSA's inability to issue notices and change orders promptly.[20]

Plaintiff requested payment for the chiller on May 16, 1979. On May 17, 1979 defendant approved payment of $55,663 to plaintiff, and withheld the balance of $23,100 as liquidated damages for 231 days at $100 per day. When plaintiff visited the site in June of 1979, the chiller was still sitting where it had been delivered, and the equipment room was still not ready to receive it.

On June 11, 1979, defendant asked Ivey's Plumbing to submit a proposal to relocate a starter on the chiller so that it would not interfere with overload pipes in the equipment room, and also to install a disconnect switch which it acknowledged was "not on contract drawings". In submitting its proposal Ivey's Plumbing asked for a time extension of 289 days, consisting of 46 days for relocating the starter, and the remainder of 243 days for "delay turn over [sic] of the government furnished chiller."[21]

When Woodward visited the site in July 1979, it appeared that Ivey's Plumbing had finally been persuaded to move the chiller into the area in which it was to be installed. But it had not yet been connected electrically or mechanically, and the electrical disconnect switch to be added by Ivey's had not yet been connected to the chiller.[22]

On August 2, 1979, Lasker-Goldman recommended that Ivey's Plumbing be given a 44-day time extension from July 2, 1979 (its scheduled completion date) to August 15, 1979 "due to the late delivery of the chiller, changing of chiller heads, and the relocation of the starter." This recommendation was approved by GSA on October 18, 1979. Note that the chiller had been delivered on April 7, 1979.

The testimony as to what, if any, actual delay resulted from late delivery of the chiller is confused and unreliable. Even GSA's witness attributes a maximum of 44 days to that problem. It was not until the fall of 1979 that plaintiff was asked for and promptly provided "start-up" service for the chiller. The chiller did not become fully operational until at least several months after that. When plaintiff, on November 7, 1979, requested the release of the $23,100 being withheld on its contract, Lasker-Goldman recommended that the claim be denied and defendant denied it on April 28, 1980. Apparently no other contractor was assessed damages for delay. It is noteworthy that Lasker-Goldman's Mr. Norton testified that, although this chiller originally lay on the "critical path" of the Glynco project, subsequent events and delays in other ar-

---

20. He testified that: "At this time there was because there was [sic] a lot of investigations going on about GSA, and there were so many review boards set up for change orders that it just—by the time it went across five men's desks, it slowed a change order down that much."

21. Contrast this with Lasker-Goldman's testimony that the equipment room was not ready to receive the chiller when it arrived.

22. On July 2, 1979 plaintiff brought in one mechanic to reverse the condenser heads, in a period of 4–6 hours. Defendant authorized

eas, had removed the chiller from the "critical path."[23]

### Discussion and Conclusions

The language of the standard contract provision on which this case hinges has been a prolific source of administrative and judicial litigation, and that language has gone through successive changes in apparent response to the litigation. Had plaintiff's contract, for example, contained the language set forth in the landmark *Andresen* decision,[24] there could be little doubt that it would prevail on the facts present in this case. In *Andresen,* as here, the contractor was a small business delivering material to the Government. The material was in turn being purchased from the plant of a large, and theretofore reliable supplier. When the supplier unexpectedly failed to deliver, the contractor purchased the material elsewhere, but not in time to meet the contract schedule. The "Delays-Liquidated Damages" clause provided that:

[A] contractor shall not be charged with liquidated damages when the delay in delivery is due to unforeseeable causes beyond the control and without the fault of the contractor, including but not restricted to * * * delays of a subcontractor due to such causes * * *.

The Board concluded that *Andresen* could not foresee—

that a subcontractor of such standing would fail to carry out its contractual obligation. The cause of the delay was beyond the control of the contractor. By the time it was known that the supplier would not make timely delivery, the kipskins could not have been purchased on the open market or from any source in time to make the deliveries. The contractor did everything reasonably possible to perform on time. There was no evidence of fault or negligence on the part of the contractor.

Although the standard provision relating to delays and liquidated damages is obviously intended as a contingency-eliminating clause (i.e., the contractor is not intended to be an insurer against delays which it is powerless to prevent), the drafters of the clause thereafter modified it to provide otherwise with respect to delay of subcontractors which were not foreseeable by or due to the fault or negligence of the contractor. The corresponding contract language in the later case of *Schweigert, Inc. v. United States,*[25] read as follows:

(d) The Contractor's right to proceed shall not be so terminated nor the Contractor charged with resulting damage if:

(1) The delay in the completion of the work arises from unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to, Acts of God, acts of the public enemy, acts of the Government in either its sovereign or contractual capacity, acts of another contractor in the performance of a contract with the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, <u>or delays of subcontractors or suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of both the Contractor and such subcontractors or suppliers</u> (Underscoring provided).

In *Schweigert,* the parties agreed that the delay was not the fault of the contractor or of a subcontractor, with which it was in privity, but rather of a second-tier supplier to the subcontractor. The court held:

[P]laintiff has recited at considerable length the background of the revisions of the default clause in standard Government contracts which strongly indicates that one of the prime purposes, if not the

---

Ivey's Plumbing to relocate the starter on July 23, 1979, at a cost not to exceed $9,138.

**23.** Items on the "critical path" are those which, if delayed, could delay overall completion of the project.

**24.** *Appeal of John Andresen & Co., Inc.,* Armed Services BCA No. 633, December 13, 1950; 5 CCF ¶ 61,182.

**25.** 181 Ct.Cl. 1184, 388 F.2d 697 (1967).

prime purpose of the clause, is to relieve bidders on Government contracts from contingencies over which they have no control and for which they need not include an item in their bids.[26] It is consistent with this purpose, so plaintiff argues, to construe the instant default clause in a manner to limit the inquiry of fault for delays to the prime contractor and its immediate subcontractors and suppliers. [Footnote omitted].

The tenor of Clause 5(d) suggests that the term "subcontractors," in the context in which it is used, means those whom the principal contractor could control or for whom it was contractually responsible, and not those concerning whose conduct and reliability a contractor could only hopefully and helplessly speculate.[27]

The language of the clause in this case parallels that in *Schweigert*, plus a subparagraph (g) which reads as follows:

As used in Paragraph (d)(1) of this clause, *the term "subcontractors or suppliers" means subcontractors or suppliers at any tier.* [Emphasis supplied].

However, based on the facts in this case, the court can be spared an inquiry of the broad scope, which that additional language would require. The record demonstrates that plaintiff's repeated requests for an extension of time based on his problems with his supplier was not acted upon by GSA.[28] The record further demonstrates that there had meanwhile developed far more serious and supervening delays which were in no way attributable to plaintiff and which became the proximate and effective cause of plaintiff's inability to complete its work. Damages are to be assessed only for "failure to complete the work within the specified time." Plaintiff's "work" consisted not only of purchasing and delivering a chiller to the site, but also of providing "start-up" service for the chiller *after* it had been installed and connected up by another prime contractor, Ivey's Plumbing.

The record shows that the equipment room in which the chiller was to be installed had not been completed when the chiller arrived. Connections and locations of items had not been worked out. Structural problems in the room, particularly in the ceiling, had to be accommodated, and GSA had to issue a "stop order" to Ivey's Plumbing. The latter was compensated with generous extensions of time. Unknown, subsurface, underground obstructions also delayed Ivey's Plumbing and the project.[29] Therefore, it was not until the fall of 1979 that plaintiff was finally requested to, and promptly did provide, "start-up" service for the chiller. Even then, the record shows, it did not become fully operational until at least several months thereafter.

In other words, although delivery and start-up of the chiller originally lay on the "critical path" of the Glynco project, subsequent events and delays not attributable to plaintiff had removed the chiller from the "critical path." Plaintiff could not "complete its work" until Ivey's Plumbing had completed its work, and it did so as soon as the equipment was installed and ready for "start-up" services.[30]

Plaintiff is entitled to an extension of time sufficient to permit it to complete its work after installation of the chiller by another contractor, and there has been no "refusal or failure to complete the work within the specified time," when it is properly extended for circumstances beyond plaintiff's control. It follows that defendant is not entitled to withhold the sum of $23,100 in liquidated damages from amounts otherwise due plaintiff under its

26. *See* and *cf.* note 7, *supra,* indicating the possible cost in the form of higher bids of "insurance" against delays which are by definition unpreventable.

27. 181 Ct.Cl. at 1189, 388 F.2d 697.

28. *See* note 16, *supra,* and preceding text. *See also,* note 19, *supra.*

29. *See* note 20, *supra,* and preceding text.

30. Defendant now attributes a maximum of 44 days of delay to plaintiff. (*See* text at note 22, *supra* ). But the record does not support a finding that even that relatively short period of delay was attributable to plaintiff. (*See* text preceding note 20, *supra* ).

contract, and that judgment in that amount is to be entered in favor of plaintiff.