FORTEC CONSTRUCTORS, Forest
Builders, Inc., and Tectonics,
Inc. of Florida

v.

UNITED STATES.

No. 547–82C.

United States Claims Court.

July 15, 1985.

David Mockbee, Jackson, Miss., for plaintiff.

Joseph T. Casey, Jr., Washington, D.C., with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant.

## OPINION

YOCK, Judge.

This contract case arises out of a dispute over a contract for the construction of an aircraft fuel maintenance facility at Moody Air Force Base, Georgia. During the course of performance of the contract, six unilateral modifications were issued by the Government. As a result, the plaintiff contends that it is entitled to extensions of contract time for work performed beyond the contract requirements and to additional direct and extended overhead costs incurred in performing this extra work, together with remission of all liquidated damages.

### Facts

The plaintiff, Fortec Constructors, a Florida joint venture, is engaged in the business of Government construction, with annual Government contract volume, since 1970, ranging from $2 million to $35 million. On April 28, 1978, the plaintiff was awarded a contract by the Army Corps of Engineers (Corps), Savannah District, in the sum of $930,000, for the construction of an aircraft fuel maintenance facility at Moody Air Force Base, Georgia. The facility contained a hangar, constructed on a heavy concrete slab with a drain pit located in the center, and concrete block bays constructed on either side of the hangar. One of the bays was for offices and the other was for equipment and storage. The contract also called for site work involving construction of force mains, water lines, a concrete apron in front of the hangar, an asphalt roadway leading to the facility, and a water tank. The contract consisted of both drawings and specifications, including the Corps' standard construction contract General Provisions dated January 3, 1977.

The notice to proceed was acknowledged by the contractor on June 16, 1978. Originally, the contract duration was 360 days, with liquidated damages to be assessed in the amount of $135 per day thereafter. The contract completion date was extended, however, through July 6, 1979, at which time liquidated damages began to be as-

sessed by the Corps against Fortec. The Government assessed liquidated damages against the plaintiff for the period July 7, 1979, through February 24, 1980, for a total of $31,455 (233 days at $135 per day).

During the course of performance of the contract, 12 modifications were issued by the Government. The plaintiff, however, refused to accept the Corps' offered remuneration for modifications P005, P006, P007, P009, P010, and P011. Accordingly, these modifications were issued unilaterally. As a result of these modifications, the plaintiff contends that it is entitled to: (1) extensions of contract time for work performed beyond the contract requirements; (2) additional direct and extended overhead costs incurred in performing this extra work; and (3) remission of all liquidated damages. Fortec also seeks additional compensation of $1,825.85 on behalf of its mechanical subcontractor, Rhodes Mechanical, for work beyond the contract requirements relating to: (1) the Corps' directive to move the hangar's unit heaters or to install explosion-proof motors if the heaters were left in their initial locations, and (2) the Corps' directive to install dielectric unions at an oil tank connection.

Thus, Fortec seeks payment of $32,408.48 for the additional work beyond the amounts already authorized by the Corps, including payment of extended overhead, and remission of $31,455 in liquidated damages.

*Discussion*

### A. Weather Modifications P005 and P007

Fortec, under Counts I and II of its Complaint, requests a time extension of 57 calendar days due to unusually severe weather encountered between October 1, 1978, and June 23, 1979. This claim comes under

contract General Provision 5(d)(1), which provides, in part, as follows:

The Contractor's right to proceed shall not be terminated nor the Contractor charged with resulting damage if:

(1) The delay in the completion of the work arises from causes other than normal weather beyond the control and without the fault or negligence of the Contractor, including but not restricted to, * * * unusually severe weather * * *.

■■■■ Unusually severe weather is "adverse weather which at the time of year in which it occurred is unusual for the place in which it occurred." *Broome Construction, Inc. v. United States,* 203 Ct.Cl. 521, 531, 492 F.2d 829, 835 (1974). *See also Cape Ann Granite Co. v. United States,* 100 Ct.Cl. 53, 71–72 (1943) *cert. denied* 321 U.S. 790, 64 S.Ct. 785, 88 L.Ed. 1080 (1944). Proof of unusually severe weather is generally accomplished by comparing previous years' weather with the weather experienced by the contractor. *See Cape Ann Granite Co. v. United States, supra,* 100 Ct.Cl. at 71–72. In the present case, contract provision 1A–06(b), a meteorological chart of past weather averages, established the usual weather conditions to be expected during contract performance. Notwithstanding the occurrences of unusually severe weather, however, a plaintiff is only entitled to an extension of contract time if such unusually severe weather has an adverse impact on the construction being performed. *See Essential Constr. Co.,* ASBCA Nos. 18491, 18611, 18652, 18707, 78–2 BCA ¶ 13,314.

On a daily basis, the contractor completed a Daily Inspection Report (DIR) and the Government completed a Quality Assurance Report (QAR). These reports record daily rainfall, temperature extremes, and a rating of how the weather affected work that day.[1] While certain testimony indi-

---

**1.** Both the DIRs and the QARs provided the following classification system for each day of the job:

CLASS A No interruptions of any kind from weather conditions occurring on this or previous shifts.

CLASS B Weather occurred during this shift that caused a complete stoppage of all work.

CLASS C Weather occurred during this shift that caused a partial stoppage of work.

CLASS D Weather overhead excellent or suitable during shift. Work completely stopped due to results of previous adverse weather.

cated that the parties did not always complete the reports on a daily basis, the Court believes that the DIRs and the QARs represent the most reliable documents presented regarding both the actual weather at the job site and its effect on job performance. Accordingly, the Court has utilized these documents in assessing the merits of the plaintiff's weather claims.

During October 1978, Fortec claims five days of weather delay. According to contract provision 1A–06(b), October averages 2.01 inches of rain, with four days receiving at least a .10 inch of rainfall. In October of 1978, both the DIRs and the QARs recorded only two days of rain, with a total monthly rainfall of .25 inches, and only one day in which at least a .10 inch of rain fell. This amount of precipitation is below the monthly average and does not constitute unusually severe weather. Therefore, Fortec's claim for five days of weather delay is denied.

During November 1978, Fortec claims eight days of weather delay. According to contract provision 1A–06(b), November averages 2.45 inches of rain, with four days receiving at least a .10 inch of rainfall. The DIRs recorded 3.25 inches for the month, and the QARs recorded 3.70 inches of rainfall for the month. Both the DIRs and the QARs recorded only three days in which at least a .10 inch of rain fell. Fortec's DIRs for the month indicate that complete work stoppage occurred on three days during the month and that partial work stoppage occurred on three other days. The QARs recorded a complete work stoppage on three days during the month and a partial work stoppage on only two other days during the month. In Modification P005, the Government granted Fortec a one-day extension for the weather delay in November of 1978. Since one additional day has previously been awarded by the Government, the Court finds that there was not such unusually severe weather

during the month as to require further extension of contract time.

During December 1978, Fortec claims nine and three-quarter days of weather delay. According to contract provision 1A–06(b), December averages 4.05 inches of rain, with six days receiving at least a .10 inch of rainfall. Both the DIRs and the QARs agree that on two days during the month there was at least a .10 inch of rain, with a total monthly rainfall of a .5 inch. This amount of precipitation is below the monthly average and does not constitute unusually severe weather. Further, while the contract indicates that weather related delay should be expected on six days during the month, the DIRs and the QARs recorded only five days in which weather related delay was experienced. Therefore, Fortec's claim for nine and three-quarter days of weather delay is denied.

During January 1979, Fortec claims twelve and one-half days of weather delay. According to contract provision 1A–06(b), January averages 3.37 inches of rain, with six days receiving at least a .10 inch of rainfall. Both the DIRs and the QARs recorded 2.0 inches of rain in January of 1979, with four days receiving at least a .10 inch of rain. In addition, however, the DIRs and the QARs recorded seven days in which weather related delay was experienced. At trial, Mr. Jack C. Cook, Jr., a Government engineer, conceded that a one-day extension for unusually severe weather in January of 1979 should have been allowed. Accordingly, this Court grants Fortec one day of delay for January 1979 and finds that further time extension is unmerited. Thus, Fortec should have expected six days of weather related delay and has now been given a seventh day to reflect Fortec's actual seven days of weather related delay.

During February 1979, Fortec claims eleven and three-quarter days of weather delay. According to contract provision 1A–06(b), February averages 4.26 inches of

CLASS E Weather overhead excellent or suitable during shift but work partially stopped due to previous adverse manner.

OTHER Explain.

rain, with eight days receiving at least a .10 inch of rainfall. The DIRs recorded 2.0 inches of rain for the month, and the QARs recorded 4.05 inches of rain. The DIRs indicate that rain fell on two days during the month and that on those two days at least a .10 inch of rain fell. The QARs indicate that rain fell on five days during the month and that on three of those days at least a .10 inch of rain fell. Since this amount of precipitation is below the monthly averages, it does not constitute unusually severe weather. In addition, under contract provision 1A–06(b), Fortec could expect eight days in which weather related delay would occur. The DIRs and the QARs recorded eight days in which weather related delay was actually experienced. Therefore, Fortec's claim for eleven and three-quarter days of weather delay is denied.

During March 1979, Fortec claims five and three-quarter days of weather delay. According to contract provision 1A–06(b), March averages 4.94 inches of rain, with seven days receiving at least a .10 inch of rainfall. Both the DIRs and the QARs recorded one day of rain in March of 1979. The reports recorded a .5 inch and .3 inch of rainfall, respectively. These amounts of precipitation are substantially below the monthly averages and do not constitute unusually severe weather. Therefore, Fortec's claim for five and three-quarter days of weather delay is denied.

During April 1979, Fortec claims nine and three-quarter days of weather delay. According to contract provision 1A–06(b), April averages 3.75 inches of rain, with four days receiving at least a .10 inch of rainfall. The DIRs and the QARs recorded approximately 1.5 inches of rain for the month, with three days receiving more than a .10 inch of rain. However, the DIRs and the QARs recorded five days in which weather related delay was experienced. In Modification P007, the Government granted Fortec a one-day extension for April of 1979. Since one additional day has previously been awarded by the Government, the Court finds that no further time extension is merited.

During May 1979, Fortec claims 10 days of weather delay. According to contract provision 1A–06(b), May averages 3.32 inches of rain, with five days receiving at least a .10 inch of rainfall. Both the DIRs and the QARs recorded a total monthly rainfall of approximately 3.45 inches, with four days receiving at least a .10 inch of rain. While the recorded rainfall exceeded the usual amount for this month, the DIRs and the QARs recorded only four days of weather related delay for the month. Under the usual rainfall data included in the contract, five days of weather related delay can be expected in May. Therefore, Fortec has not suffered any delay which was the result of unusually severe weather, and Fortec's claim for 10 days of weather delay is denied.

During June 1979, Fortec claims five and one-half days of weather delay. According to contract provision 1A–06(b), June averages 3.34 inches of rain, with five days receiving at least a .10 inch of rainfall. While the DIRs recorded no rainfall during the month of June, the QARs recorded one day with more than a .10 inch of rain and a monthly rainfall· of approximately .24 inches. These amounts of precipitation are below the monthly averages and do not constitute unusually severe weather. Further, while the contract indicates that weather delays could be expected on five days during June, the DIRs and the QARs recorded only three days of weather related delay for the month. Therefore, Fortec's claim for five and one-half days of weather delay is denied.

In summary, as to the plaintiff's claim for time extension due to unusually severe weather, this Court will only allow Fortec the one-day extension of contract time conceded by the Government for the weather delay that occurred during the month of January 1979.

### B. Modification P006 (Valve Pit)

On · June 23, 1980, the Government issued unilateral Modification P006 in the amount of $7,050.07, without any time extension, as a result of the Corps' design

error, contained in the original contract, in the dimensions of the project's underground water line valve pit. The modification ordered the enlargement of the valve pit from 5 feet by 5 feet to 13 feet by 12 feet 2 inches, following the contractor's discovery that a 5 foot by 5 foot valve pit would not physically hold the piping required to be installed. The valve pit was constructed below ground and contained concrete slab walls through which pipes and valves ran to provide shut-offs for distribution of water from the water tank. This unilateral modification was rejected by Fortec, since it neither included payment of all direct costs and extended overhead nor an extension of contract time. As a result of the additional work, Fortec seeks payment for this change in the amount of $12,325.04, including payment of extended overhead for 14 days, and a time extension of 14 days. Thus, under Count III of its Complaint, Fortec seeks to actually recover $5,274.97 in addition to the amount previously paid by the Government under Modification P006.

The existence of the Corps' design error was first brought to the Corps' attention by Mr. Kelvin Wright, Fortec's superintendent, by letter dated March 26, 1979. Excavation for the valve pit began on April 4, 1979. By letter dated April 13, 1979, the Corps acknowledged that a design error did exist and advised that a modification would be issued that would increase the valve pit size. New dimensions for the valve pit were given to the contractor on April 23, 1979, and the reinforcement detail, which was required to construct the enlarged valve pit, was confirmed by letter dated April 26, 1979. Fortec then began forming the foundation in early May of 1979. The walls were poured on May 4, 1979, and the roof for the valve pit, which was the last item of work, was installed on May 23, 1979. Modification P006 was issued unilaterally by the Government on August 24, 1979, in the amount of $5,039.80, based on the Corps' construction cost estimates. No time extensions for the extra work was allowed. While Modification P006 was revised by the Corps on June 23, 1980, to

allow $7,050.07 for this unilateral change, the increased amount was still based on the Corps' estimated construction costs. Also, the revised modification did not allow any time extension or extended overhead costs. This revised unilateral modification was also rejected by Fortec for the above reasons.

The Government's resident engineer and contracting officer's representative for this contract, Mr. Jack C. Cook, Jr., admitted, at trial, that the work on the valve pit caused some delay to the contractor and that he recognized that the same people constructing the valve pit were also doing other work on the project.

Fortec employed a small general contracting crew of under 10 men. Since construction of the valve pit was the responsibility of Fortec, in its capacity as the general contractor, the same workmen used to construct the enlarged valve pit were also the same workmen employed by Fortec to do the piping work for the force main, to install the roofing material, to install interior finishes and fixtures, and to construct concrete work, manholes and valve chambers. Accordingly, the additional time required for the crew to construct the much larger valve pit prevented them from doing other work during this period and thereby had a direct impact on the overall progress of the project.

Mr. Cook further testified that the authority to proceed with this change was not issued until July 25, 1979, although Fortec advised the Corps of the problem in March of 1979, four months earlier. Fortec, however, proceeded to do this work and, in fact, substantially completed the work before July 25, 1979. If Fortec had awaited direction from the Corps to proceed, the work would have been done after the scheduled contract completion date and during the period in which Fortec was being assessed liquidated damages by the Corps.

Mr. Francis Chin, Fortec's Quality Control Representative at the contract site, testified that there was considerable delay

resulting from the Corps' defective design of the valve pit. He estimated the length of the delay at between seven and eight weeks. In addition, Mr. Rodney Guise, Fortec's Project Manager, testified that the delay was at least 14 days and that he felt that a contract extension of 14 days would be a very reasonable figure for the delay involved, particularly in view of the size change to the valve pit and the relatively small number of Fortec's own workers on the job. The Court agrees with Mr. Guise's assessment and allows a 14-day extension for the Government-caused delay in the valve pit construction.

In addition, the plaintiff's claim of $12,-325.04, for the extra work required to construct the valve pit, is reasonable and will be allowed. The plaintiff submitted its direct costs for the valve pit work on July 5, 1979, in the amount of $8,363.00. The plaintiff then added to this figure the extended overhead of $318.36 per day for 14 days, 10 percent profit, and the bond premium.[2] This amounted to $14,176.04. The plaintiff then deducted $1,851, as the original bidding estimate on the 5 foot by 5 foot valve pit. Thus, the plaintiff is entitled to receive $12,325.04 as reasonable compensation for the extra work.

The Government's $7,050.07 modification allowance was based only on the Government's cost estimates, rather than on actual costs, and did not include any amounts for extended overhead, profit, and bond premium. This amount simply does not make the contractor whole for the extra work required because of the Corps' design error. The plaintiff's claimed amount does.

Accordingly, after carefully considering all of the evidence presented on this issue, the Court finds that Fortec is entitled to recover an additional $5,274.97, including 14 days of extended overhead, and a time extension of 14 days for this Government-caused delay.

### C. Modification P009

Modification P009, unilaterally issued by the Corps and rejected by the plaintiff, included four different items. Those items are as follows:

1. the removal of an existing septic tank to eliminate its conflict with the foundation work;

2. the deletion of the contract requirement for Fortec to remove the existing overhead electrical lines;

3. the change in design of the trench frame and grate that was located at the center of the hangar concrete slab; and

4. the adjustment of the hangar doors to correct their improper operation caused by the deflection of the steel roof trusses. The Corps authorized payment of $6,800.15 and a one-day extension of contract time for these four changes under General Provision 3, Changes, of the contract. Fortec, however, seeks a total of $21,167.78 for these four changes, including extended overhead for 36 days, together with an extension of contract time of 139 days.

### 1. Removal of the Septic Tank

It was acknowledged by the Corps, at trial, that the existence of an underground septic tank at the location of the hangar foundation constituted a differing site con-

---

**2.** The extended overhead rate originally claimed by Fortec on the disputed modifications herein was $550.48 per day. This computation, which included home office overhead, was figured according to the *Eichleay* formula (*Eichleay Corp.,* ASBCA No. 5183, 60–2 BCA ¶ 2688) and was made during the course of the job, before the actual time of completion was known and before the total revenue and expenses incurred during actual contract performance could be known. The propriety of using the *Eichleay* formula to compute home office overhead was acknowledged by the Corps at trial. The extended home office overhead was recomputed

and was stipulated by the parties that the correct daily home office overhead rate was $57.88 per day. Accordingly, Fortec now seeks $318.36 per day extended overhead for each day of delay, including $57.88 per day for home office overhead and $260.48 per day for direct job overhead. Additionally, the contractor's bond premiums on changes should be computed at .00525 percent, as agreed at trial, rather than at the rate of .0075 percent indicated in Fortec's original change order estimates. In view of the evidence presented on these matters, the Court finds these figures to be reasonable and applicable to the plaintiff's claims herein.

dition under General Provision 4, Differing Site Conditions, of the contract, entitling Fortec to additional compensation and to a one-day extension of contract time.

The Corps paid Fortec $1,244.64 and granted a one-day time extension for removal of the septic tank. Fortec, however, seeks $1,327.33 for this change, including extended overhead for one day. The costs submitted by Fortec are reasonable as is Fortec's request for a one-day extension of contract time, since the evidence indicates that removal of the septic tank directly delayed the work on the hangar foundation by one day. The foundation for the hangar was a critical early item of work at the time.

Fortec's direct costs for this item of work were $882. The plaintiff then added to this figure extended overhead of $318.36 for one day, 10 percent profit, and the bond premium. This amount equals $1,327.33. The Court finds this figure to be reasonable and appropriate.

Accordingly, Fortec is entitled to recover an additional $82.69, representing the difference between the amount Fortec is entitled to be paid for removal of the septic tank and the amount previously paid by the Corps, and to receive a one-day extension of contract time.

### 2. Deletion of removal of electric poles and wiring

Prior to trial, Fortec never agreed to the reduction in contract price included in Modification P009 for deletion of the electric pole removal work, which was not required since the poles and wires shown on the drawings were not in fact present at the site. At trial, both parties agreed that $646.92 for the deletion of this work is reasonable and should be deleted from the total claimed by Fortec for the remaining additional work that was performed under unilateral Modification P009. Accordingly, this Court will delete $646.92 from the total claimed by Fortec for the additional work under Modification P009.

### 3. Trench frame and grate

The contract called for the installation of an iron frame and grate over a 53 foot long concrete trench, which was to be placed in the center of the sloped slab concrete floor in the main hangar area of the building to allow water and other residue to flow into the pit. The hangar is 84 feet long by 84 feet wide. The roof above the pit is approximately 25 to 30 feet high and is placed upon exposed metal joists. During the course of construction, Fortec determined that the frame and grate, as detailed in the contract specifications, did not have sufficient design strength to adequately support the aircraft wheel loads that would be placed on the frame. Specification 5M1–16 called for a grate that would support some 10,800 pounds per square foot, whereas the drawings seemingly called for support of approximately 75,000 pounds per square foot. Since the Corps' frame and grate design specifications and drawings were in conflict, the trench could not be constructed until the necessary weight and load strength of the grate was selected by the Corps, because the size of the grate determined the support required in the concrete trench slab.

The problem first surfaced when Fortec sent its shop drawings to Mr. Cook for approval on January 23, 1979. Its grate fabricator (Neenah Foundry Company) had designed the grate to the weight limits indicated in the specifications. Mr. Cook rejected the drawings on January 29, 1979, with all notations referring to the drawings and none to the specifications. Apparently, Mr. Cook did not check the weight support required by the specifications. The next documentary evidence of the problem occurred on April 16, 1979, when Mr. Kelvin Wright, Fortec's Superintendent, wrote an urgent letter to the Corps, which detailed the problem. The letter requested a decision as to the support weight required of the grate as soon as possible so that the grate could be ordered and fabricated, since the "impact of the situation * * * at this stage is so critical." The trench had been originally formed on April 6, 1979, but final pouring of the concrete had to be

stopped awaiting correction of the design defect. When Mr. Francis Chin arrived on the job as Quality Control Representative in mid-April of 1979, the center area of the hangar floor was still open, since Fortec had not yet received instructions on the grate design requirements. By telegram dated April 20, 1979, Fortec again requested clarification concerning the design criteria for the frame and grate. By letter dated April 26, 1979, Mr. Chin wrote to the Corps again requesting the revised design criteria for the grate. Finally, by letter dated May 14, 1979, Mr. Chin confirmed that the design criteria for the grate had been verbally communicated to him. Immediately thereafter, the grate was ordered by Fortec and finally arrived on July 27, 1979.

The Government's delay in correcting the frame and grate design defect significantly delayed work inside the hangar area. Particularly, the completion of the concrete slab was delayed awaiting a decision by the Corps on the frame and grate. However, in an effort to minimize the effect of the delay being caused by the frame and grate design defect, Fortec proceeded to pour the concrete floor slab except for the center portion, leaving exposed an area 53 feet long by 16 feet 8 inches wide. Thus, an area 53 feet by 16 feet 8 inches, out of a total area of 84 feet by 84 feet, was left unpoured until August 6, 1979.

This procedure was decidedly abnormal. Normally, the entire concrete slab is poured continuously. However, partial pouring of the floor slab, with the middle open, allowed Fortec to work around the trench area but still resulted in a Government-caused delay. The open area in the middle of the slab hindered direct access and impeded the subcontractors' work, since they could not move their rolling scaffolding across the floor area freely. Specifically, the electrical subcontractor, the sprinkler subcontractor, the finishers, the alarm subcontractor, and all other trades working inside and overhead were delayed.

At the same time, the hangar interior was exposed to the elements, since the roof ventilator, another design change under Modification P011, had not been installed, leaving the center of the hangar roof above the trench open and exposing the clay soil in the hangar trench to the weather. As Mr. Chin testified at trial, the open trench created a muddy condition slowing the overall work being done in the hangar area.

The Corps' estimate for the direct cost of this change was $4,797.46. Fortec, however, seeks payment of $13,536.87 for this change, including 25 days of extended overhead and a 101-day extension of contract time. The 101 days is the time from the Corps' disapproval of the original shop drawings (January 29, 1979), which contained a frame and grate according to the original contract design specifications, through the date of receipt of verbal instructions concerning the new loading requirements (May 10, 1979). The total time that elapsed, as a result of the frame and grate change (the period from submittal of the original shop drawings until the installation of the new frame and grate) was some 191 calendar days.

Fortec is claiming $13,536.87 as its reasonable costs in performing the extra work involved in correcting the Government's frame and grate design error. Fortec's direct costs were $6,996, which represent the cost of the new frame and grate and transportation to the job site. To that figure, it added 25 days of extended overhead at $318.36 per day, a 10 percent profit, and a bond premium of .00525 percent. This computation equals $16,536.87. From this figure, it subtracted $3,000, for the bidding estimate on the old frame and grate, to arrive at the $13,536.87 figure claimed. In addition, Fortec is claiming a 101-day extension of contract time as a result of the alleged Government delay.

The Corps, while acknowledging that its specifications were defective, only allowed the plaintiff a total of $4,797.46. It arrived at this figure by allowing the plaintiff 75 percent of the directs costs ($5,250.00) and subtracting a percentage of the old frame and grate bid ($1,417.50) for a total of $3,832.50. It then added: sales tax of 4

percent ($153.30); overhead of 10 percent ($398.58); profit of 8.85 percent ($388.02); and bond premium of .00525 percent ($25.06). The Corps' resulting allowance to the plaintiff was $4,797.46. The Corps, however, refused to allow payment of any extended overhead and refused to allow any extension of contract time due to the design defect. The Government's sole rationale being, as will be discussed later, that Fortec failed to justify these requests by reference to the network analysis schedule (NAS).

The evidence presented, however, proved to the satisfaction of this Court that the project was delayed, in fact, at least 101 days by virtue of the Corps' design defect and that a claim for payment of at least 25 days of extended overhead, during this period, was also reasonable. It appears reasonable to this Court that the 101 days should be charged to the Government as delay from the day Mr. Cook denied the plaintiff's shop drawings on the grate (without looking at the defective specifications) on January 29, 1979, to the day the plaintiff was verbally notified of the appropriate weight support figures to be incorporated into the new design frame and grate on May 10, 1979. While the plaintiff has limited its claim for recovery to only 25 days of extended overtime, it may well have succeeded in proving more to this Court had it chosen to do so. In any event, this Court believes that a 25-day extended overhead figure is reasonable under the factual circumstances involved herein.

Accordingly, Fortec is entitled to recover $13,536.87 for the additional work necessitated by this design defect, including 25 days of extended overhead, less the $4,797.46 previously paid Fortec for this work. The Court finds such amount to be reasonable in view of the extra work performed by Fortec. In addition, Fortec is entitled to a 101-day extension of contract time for this Government-caused delay.

### 4. Hangar doors

The hangar doors consist of six large panels that slide across the front opening of the hangar and that are supported by a steel truss 87 feet long. The parties are in agreement that Fortec originally installed the hangar doors in accordance with the contract specifications. The steel truss, however, was not adequately designed to support the weight of the hangar doors. Once the doors were hung, the truss deflected downward several inches rendering the doors inoperative. Specifically, when the two center door panels were raised into position, it was discovered for the first time that the rollers hit the main truss in the center position, thus jamming the doors. Initially, the rollers were lowered, but this caused them to miss the guides at the top of the doors. Finally, a contractor-designed three-inch extension was welded to the bottom tip of the angle guides, solving the problem.

Fortec sought a change to the contract under General Provision No. 3, Changes, seeking additional compensation, including 10 days of extended overhead, and a 32-day time extension.[3] The time required to correct the deflection problem took 44 days, from the discovery of the design defect on August 8, 1979, as indicated on the contractor's Daily Inspection Report for that date, through completion of the modification work on September 21, 1979. Mr. Cairns, the Corps' inspector, admitted that there was a Government-caused delay from the time the problem was recognized until it was corrected. Mr. Cairns could neither pinpoint the exact amount of delay involved nor identify any document that would assist the Court on this issue. However, he did testify that the delay from the point of discovery of the design defect on August 8, 1979, to the time of resolution could well have been one to two weeks. He was definite that the work needed to implement the solution consumed four days. Mr. Chin, likewise, was unable to be precise on the amount of delay, but, when pressed, he

---

**3.** Fortec seeks a 32-day extension of contract time, but only 10 days of extended overhead, due to the concurrence of this delay with other delays discussed herein.

offered a figure of three to four weeks. Mr. Guise testified that Fortec's claim for a 32-day contract extension was a very reasonable figure and that the 10 days of extended overhead was more than reasonable, since the cause for the delay was another defective Government design specification.

Fortec's inability to complete the doors delayed installation of door controls and trim as well as completion of the overall hangar project, since the doors were on the critical path and since the doors had to be completed before the project would be accepted. Further, all of this corrective work was performed by Fortec after the contract time had expired and while the Corps was assessing liquidated damages against Fortec.

Given the foregoing facts, Fortec's request for a 32-day extension of contract time and for 10 days of extended overhead, in light of the amount of direct costs and concurrence of other delays, is reasonable. The plaintiff computed its claim for the hangar door extra work at $6,303.58. It had direct costs (materials and service equipment) of $2,517, to which it added the 10 days of extended overhead at $318.36 per day, 10 percent profit, and the bond premium of .00525 percent. The resulting figure is $6,303.58.

The Corps allowed the plaintiff only $1,404.97 for this additional work. Specifically, the Corps allowed the plaintiff only $1,048.01 for its direct costs, to which it added subcontractor overhead of 10 percent ($104.80), subcontractor profit of 9.6 percent ($110.66), prime contractor overhead of 5 percent ($63.16), prime contractor profit of 5.35 percent ($70.97), and a bond premium of .00525 percent ($7.37), for a total allowable change of $1,404.97. In view of the evidence received on this design defect, the Government was simply unreasonable in not allowing the plaintiff's direct costs of $2,517 and the 10 days of extended overhead. Overall, the plaintiff's calculations are reasonable and will be accepted by this Court as such.

Accordingly, Fortec is entitled to payment of $6,303.58, including 10 days of extended overhead, less the $1,404.97 previously paid Fortec for this work. In addition, Fortec is entitled to a 32-day extension of contract time for this Government-caused delay.

### D. Modification P010 (Concrete Slabs)

The contract called for the pouring of 144 concrete slabs in front of the hangar, at a cost of $60,000. Two concrete slabs, DX 8J and DX 8K, were determined to be defective by the contracting officer, and a deduction of $3,630.94 was unilaterally taken. The Government's evidence presented at trial is to the effect that this amount should be reduced to $2,000.

Under Count V of its Complaint, Fortec claims that the parties reached a mutual agreement to accept a $600 credit for the defective slabs and that the deduction of any amount above $600 is unreasonable. Fortec's Project Manager, Mr. Guise, who claims to have negotiated the $600 credit with the Government, based his testimony upon a handwritten note on a contract form, but he does not remember when the agreement was reached, where the meeting took place, or who accepted the credit on behalf of the Government, and no record was ever made of any conversation confirming the agreement. The contracting officer's representative, Mr. Cook, testified that he did not agree to and is unaware of any agreement to accept a $600 credit for the defective slabs. There is no tangible evidence to the effect that the parties reached an agreement to accept $600 as a credit for the defective slabs.

The contract contained detailed specifications on when concrete slabs must be replaced and when they could be repaired. These provisions also allowed the contracting officer to accept defective work with an appropriate credit to the Government. The evidence clearly shows that the two concrete slabs were defective under the specifications. The proposed credit of $2,000 is a reasonable cost for the two defective slabs, since one slab and a part of a second slab must be replaced and since additional

work would be required to provide load transfer to other concrete slabs. Further, Fortec presented no evidence to establish that *replacing* these slabs would cost less than $2,000.

Accordingly, since the Government has already withheld $3,630.94 for the two defective concrete slabs, the plaintiff is entitled to be reimbursed $1,630.94, the difference between the $3,630.94 previously withheld by the Corps and the $2,000.00 credit awarded to the Government herein.

E. Modification P011 (Roof Ventilator)

On June 16, 1980, the Corps issued unilateral Modification P011, in the sum of $5,335, for installation of a more sophisticated and expensive roof ventilator than reasonably called for under the original contract specifications. It is undisputed that the roof ventilator actually installed was a change to the contract pursuant to Clause 3 of the General Provisions of the contract. Fortec refused to accept Modification P011 on the basis that it did not adequately compensate Fortec for the reasonable costs incurred in purchasing and installing the upgraded roof ventilator and that it did not grant Fortec an extension of contract time and extended overhead for the delay to the project incurred as the proximate result of the change. The "problem" connected with the roof ventilator was that the original contract drawings included a roof ventilator, while the technical specification laying out the details of the ventilator were omitted from the contract documents. The plaintiff notified the Corps of this design omission by letter dated March 26, 1979. The Corps acknowledged the design omission by letter dated April 13, 1979, and ultimately agreed that this omission amounted to a change in the original contract. Fortec, under Count VI of its Complaint, is presently seeking payment of $12,136.81, including 19 days of extended overhead, together with a 37-day extension of contract time for this additional work.

By letter dated November 5, 1979, Mr. Guise set forth the delay incurred by Fortec in connection with the roof ventilator design change. In Mr. Guise's letter, it was pointed out that 162 calendar days elapsed between the time that Fortec notified the Corps of the problem with the roof ventilator (March 26, 1979) and the day that the roof ventilator arrived at the job (September 4, 1979). However, Fortec is only seeking an extension of contract time for the delayed shipping time between July 27, 1979, and September 4, 1979, a period of 37 days, and, during this period, only 19 days of extended overhead due to the concurrence of this delay with other Government-caused delays.

Completion of the hangar roof was delayed by the change in the type of ventilator that was to be installed directly above the open trench in the hangar floor. Since the roofing was on the critical path of contract completion, the change in the roof ventilator necessarily delayed ultimate completion of the entire project. Before the ventilator arrived, the roof could not reasonably be completed. Without the technical specifications spelled out in the contract, the contractor could not be sure what load requirements the ventilator would place on the curbing and roof. Moreover, the roofing could not be completed prior to installation of the ventilator, since the insulation felts and tar could not be applied until the curb, on which the ventilator is attached, was installed. Thus, the contractor was reasonably justified in not sealing the roof around the curb. Therefore, the center of the roof area remained open, permitting the entry of rain into the hangar and in turn into the trench below, which, as discussed above, was also left open awaiting the design information for the frame and grate. Both of these items delayed and impeded completion of the work in the hangar area and completion of the overall project. Both of these items were either design defects or design changes that were the Corps' responsibility. The inability to waterproof the hangar area delayed the work of various subcontractors working in the hangar, since they did not want to complete the work before the building was watertight and subject

themselves to repair work that might be damaged by water. In addition, these same subcontractors were delayed by the absence of a concrete floor slab in the center of the hangar. The Court finds that the contractor was reasonable in delaying the completion of the roof until the ventilator was received, in order to ensure the appropriate load requirements to be placed on the curb and roof and to ensure that the roofing itself was not torn up by the ventilator installation.

In early August of 1979, after the new frame and grate was received, the roof ventilator opening was sheathed in with plywood and visqueen. This was accomplished in order to allow Fortec to finish pouring the concrete hangar slab and to install the frame and grate directly below the roof ventilator opening. Since the contract did not contemplate such sheathing, Fortec was forced to incur additional costs in order to complete the construction. Fortec was finally able to install the ventilator on September 8, 1979, four days after it was delivered, at a time when the Corps was assessing Fortec liquidated damages.

The evidence clearly indicates that Fortec is entitled to an extension of time and to payment of extended overhead for the delay in receiving the roof ventilator. Mr. Cook, in an internal memo dated November 15, 1979, stated that the delay between March 26, 1979, and April 19, 1979, (24 days) was a Government-caused delay. However, he went on to state that the contractor was delaying himself concurrently and, therefore, denied any time extension. It is interesting to note, however, that the Government, at trial, failed to introduce any evidence establishing specific contractor-caused delays. Further, it should be emphasized that during this same period, Fortec was being delayed as a result of Government design error changes on the valve pit and on the frame and grate. Mr. Cook also noted, in a subsequent internal memorandum dated November-

ber 19, 1979, that Mr. Guise's request for a 39-day extension of contract time had merit, since if the contract specifications had been complete the delay would not have been encountered. Mr. Cook, however, simply did not think that a 39-day extension was warranted. Mr. Cook was willing to offer a 24-day extension of contract time, however, as evidenced by his internal memorandum of November 15, 1979. Finally, Mr. Cook noted that Mr. Ball, who was employed by the Corps in contract administration, believed that additional time to procure the ventilator should have been granted to Fortec from the date the revised specifications were provided on April 19, 1979.

■ This Court, as discussed later in this opinion, does not believe that the Corps can validly assert that the contractor is precluded from entitlement to an extension of contract time for one change merely because he is concurrently being delayed on other changes for which the Corps is also responsible and is also denying extensions of time. It is significant to note that Mr. Cook limited the extent of the delay to the period March 26, 1979, through April 19, 1979, because he believed that the original curb for the roof ventilator could have been installed and that the roofing could have thereby proceeded. The evidence revealed, however, that additional curb reinforcement was ultimately required before the ventilator could have been installed. If the ventilator curb had not been reinforced, damage would have been caused to any roofing which had been installed before the ventilator was installed. Accordingly, this Court finds that Fortec acted prudently in waiting to install the curb until the roof ventilator had been delivered and the required curbing reinforcement work performed.

Fortec is claiming $12,136.81 as its reasonable costs in connection with performing the Government's change on the roof ventilator for Modification P011.[4] Fortec's

---

**4.** The Court notes a minor discrepancy between the amount claimed by the plaintiff of $12,-136.81 in its Findings of Fact, para. 8, and the

$12,116.81 also claimed in its Findings of Fact, paras. 59 and 68. Neither of these figures, however, can be computed by using the same meth-

direct costs were $6,175, representing the materials and labor needed for the installation. To that figure, the Court has added 19 days of extended overhead at $318.36 per day, 10 percent profit, and the bond premium at .00525 percent. This computation equals $13,516.81. From this figure, the Court has subtracted $1,680, as the original bidding allowance, to arrive at the $11,836.81 figure allowed. This figure reasonably represents the amount that Fortec is entitled to recover for this extra work. In addition, the Court finds that the plaintiff's request for a 37-day extension of contract time is likewise reasonable.

The Corps allowed the plaintiff only $5,355, notwithstanding its acknowledged responsibility for causing Fortec substantial delay. It allowed the plaintiff some $6,031 for direct costs, to which it added 10 percent overhead, 6.55 percent profit, and a 1 percent bond premium, for a total allowance of $7,140. It then subtracted $1,785, as a credit for a minimum quality ventilator and curb, to arrive at its allowance figure of $5,355. The Corps, however, refused to allow Fortec any extended overhead and refused to allow any extension of contract time due to the Corps' change.

Here again, the Government has justified its refusal to grant Fortec additional time and extended overhead on the basis that the plaintiff was delaying the construction of the project itself and was thus due no delay or extended overhead allowance from the Government. As already discussed, this stance is totally unacceptable and will not be countenanced.

Accordingly, Fortec is entitled to recover an additional payment of $11,836.81, including 19 days of extended overhead, less the $5,355 previously paid Fortec for this work. In addition, Fortec is entitled to a 37-day extension of contract time for this Government-caused delay.

### F. Subcontractor Claims

Fortec submitted two claims on behalf of its mechanical subcontractor, Rhodes Mechanical. The first claim dealt with the Corps' directive that Rhodes either move the hangar's unit heaters out of the hazardous zone indicated on the contract drawings or provide explosion-proof motors for the unit heaters. Rhodes elected to move the heaters, and Fortec submitted a claim for additional compensation for the additional work. The second claim relates to the Corps' directive that dielectric unions be provided where the hangar's copper piping connects to the steel fitting on the hangar's oil tank. Fortec claims the contract only requires dielectric unions at pipe connections and not at the connection between the copper piping and the steel fitting on the oil tank.

### 1. Unit Heater Claim

The contract drawings indicated the location of the unit heaters and also the location of the hazardous area within the hangar as being four feet above the floor and two feet from the walls of the hangar. The unit heaters were hung by the subcontractor approximately four feet from the hangar walls. As a result, the Corps gave Fortec the option of either furnishing explosion-proof motors or moving the heaters out of the hazardous area.

Contract Specification Section 16W1–2.1 required that the heaters' installation conform to the requirements of the National Electric Code. In case of any differences or discrepancies between the specifications and the National Electric Code, the specifications were to govern. Here the specifications did not detail whether explosion-proof motors were required to be a part of the unit heaters. The National Electric Code, however, incorporated by reference into the specifications, clearly required explosion-proof motors in unit heaters installed within a hazardous area. Under the contract drawings, Fortec could have elected to install the unit heaters within the hazardous area if it provided explosion-proof motors in those unit heaters. Alternatively, it could have installed the unit heaters out-

---

odology that was used by the plaintiff to justify its other claims herein. Since the prior methodology has already been approved and adopted

by this Court as reasonable, it will be used to compute the plaintiff's allowable claim in this instance also.

side of the hazardous area without explosion-proof motors. Regardless of where the unit heaters were installed, the plaintiff had to comply with the National Electric Code, unless it conflicted with the specifications. Since the specifications were silent on the point of whether explosion-proof motors were to be included in the unit heaters, this Court finds that no conflict existed between the specifications and the National Electric Code. Accordingly, the provisions of the National Electric Code, regarding explosion-proof motors in unit heaters, were binding on the plaintiff.

In addition, this Court believes that common sense should have dictated that the subcontractor, if it had any doubts about where the unit heaters were to be located or whether explosion-proof motors were to be provided, should have consulted the appropriate on-site Corps personnel before proceeding to install the potentially hazardous motors in a hazardous area. Since Fortec and its subcontractor misinterpreted the specifications, they are not entitled to additional money or to an extension of contract time for the reinstallation of the unit heaters.

### 2. Dielectric Union Claim

 Fortec next seeks to recover the additional cost incurred in installing a dielectric union between the copper pipe and the steel fitting on the oil tank. A dielectric union is a union which prevents corrosion between different types of metal which are placed in contact with each other, in this instance, between copper pipe and a steel tank extension. The contract, in Section 15H3, subsection 18.6.3.1, *Dielectric Pipe Unions*, provided that:

> *Dielectric pipe unions* shall be provided between ferrous and nonferrous piping to prevent galvanic corrosion.

The issue thus presented is whether the steel junction of the oil tank and the copper pipe is a "joinder of ferrous and nonferrous piping." It is Fortec's position that there is no requirement in the specifications that dielectric unions be provided at equipment connections. While there is a specific requirement for dielectric unions between

ferrous and nonferrous *piping*, there is no contract requirement for such unions at equipment connections. Here, Fortec provided dielectric unions between ferrous and nonferrous piping.

After considering all of the evidence, this Court believes that the steel reducer fitting was a part of the piping system connected to the oil tank and that Fortec, therefore, is not entitled to recover on this claim.

### G. The Network Analysis System

The network analysis system (NAS) required by the contract, Section 1C–14,[5] included a network diagram, showing the order and interdependence of activities and the sequence in which the work was to be accomplished as planned by the contractor, and a mathematical analysis of the network diagram, including a tabulation of each activity. Fortec chose to use the critical path method (CPM) network analysis system.

The CPM breaks down the entire project into individual tasks and assigns a number of days anticipated to perform each task. In *Haney v. United States,* 230 Ct.Cl. 148, 167–68, 676 F.2d 584, 595 (1982), this Court's predecessor, the United States Court of Claims, described the CPM in the following manner:

> Essentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay,

or acceleration, of work along the critical path will affect the entire project.

Further, in *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 728 (1984), this Court stated that:

The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path had an impact upon the time in which the project was completed. If work on the critical path was delayed, then the eventual completion date of the project was delayed. Delay involving work not on the critical path generally had no impact on the eventual completion date of the project.

The Court went on to recognize, however, that the critical path can change and that items not originally on the critical path can become critical. *Id. See Morris Mechanical Enterprises, Inc. v. United States*, 1 Cl.Ct. 50, 58, 554 F.Supp. 433, 441 (1982). Thus, if the CPM is to be used to evaluate delay on the project, it must be kept current and must reflect delays as they occur.

In the instant case, the CPM was updated only once, in August of 1979. This update did not consider delays in work performed prior to the update, nor, obviously, in work that occurred after the update through the date of acceptance of the project by the Corps. Mr. Kaplan, Fortec's president, testified that CPMs are normally not updated on projects having an anticipated duration of less than a year, since the time required to get signed modifications from the Corps and to get the CPM consultant to update the computer material based on those modifications exceeds the time available in short-term projects. The project involved herein had an anticipated duration of only one year and was thus a short-term project.

Despite the obvious failure of both parties to use the CPM for scheduling purposes during construction, the Government now claims that the additional work Fortec was required to perform does not justify any contract time extensions, since the CPM does not show that any of the additional work was on the project's critical path. In support of its position, the Government relies entirely upon the once-revised CPM, which does not reflect the critical path actually followed during construction. It is interesting to note, however, that the Government, while arguing that it prepared CPM schedules to evaluate Fortec's claims for extension of contract time, introduced CPM schedules showing the "removal of telephone poles" to be on the critical path. As already discussed above, such telephone poles, since they never existed, could not have represented the critical path. If the Corps updated the CPM each time it evaluated Fortec's claims, it failed to introduce such updated CPM schedules at trial. In fact, the parties have agreed that, during the course of contract performance, only one revision to the original CPM was ever done.

Mr. Cook testified that: (1) the CPM diagram introduced at trial did not depict the actual critical path, since it was not current as of the updated mathematical summaries offered into evidence; (2) the activities on the mathematical summaries would not show up after they were completed; and (3) the information set out on the mathematical summaries represented an estimate that was prepared prior to performance. Mr. Cook not only admitted that the CPM in evidence did not reflect actual performance, but he also admitted that the critical path can and does change during performance. Indeed, Mr. Cook acknowledged that delay encountered in completion of a noncritical item may make that item critical so that "every month, conceivably, the critical path would change," which is precisely what happened in the instant case. The critical path changed from that depicted on the CPM diagram introduced into evidence. The Corps, however, refused to grant timely and adequate time extensions and to authorize revisions to the CPM to reflect the changed performance critical path. As a result, it is impossible to determine from the CPM diagram whether a particular activity was critical or noncritical, on schedule or behind schedule. Further, the Corps failed to even consider

several of Fortec's requests for additional compensation and time extensions until after the project was completed. Fortec could not update the CPM without receipt of modifications from the Corps adding the additional work, and then only with the concurrence of the Corps as to the time to be added. Contract § 1C–14(c)(2). Accordingly, Fortec was unable to update the CPM during construction. This inability, caused by the Corps' failure to act in a timely fashion, should not now be used as a sword against Fortec.

Reliance upon an incomplete and inaccurate CPM to substantiate denial of time extensions is clearly improper. While the contract states that the CPM shall be used to evaluate the impact on the contractor's work in determining the allowance of time extensions, it also states that the CPM to be so used must include time revisions. Contract § 1C–14(c). Consequently, the contract requires the use of a properly revised and updated CPM to evaluate claims for time extensions.

Section 1C–14(d) provides for revisions to the CPM where contract changes are made by the Government. This provision provides that, where the Government revises the work in such a way as to affect the sequence or duration of activities, the contractor shall promptly revise the logic on the diagram *following* issuance of a notice to proceed. This provision further provides that, "if the Contractor fails or refuses to incorporate the changed work in network, the Contracting Officer may furnish logic revisions which the Contractor shall include and use in the network analysis until the modification is settled or until actual dates supersede the estimated data." In the instant case, where no notices to proceed were issued by the Corps, except for the valve pit notice to proceed, which was itself issued after the fact, and where the Corps refused to acknowledge any time extensions, Fortec was unable to make any changes to the CPM. Accordingly, the express language of the contract requires the rejection of the use of an incomplete CPM to evaluate Fortec's time extension requests. Contract § 1C–14(d).

It is difficult, if not impossible, for this Court to comprehend how the Corps could have used the CPM to evaluate Fortec's time extension claims without modifying the CPM to reflect the additional work Fortec was directed to perform—the valve pit, the frame and grate, the hangar doors, and the roof ventilator. These items were all major components of the hangar project. If the Corps made such modifications to the CPM, this Court cannot understand why the Corps did not issue a formal modification (logic revision), which Fortec would have then been required to include and use in its CPM analysis.

In *Continental Consolidated Corp.*, ENG BCA Nos. 2743 and 2766, 67–2 BCA ¶ 6624, the Army Corps of Engineers Board of Contract Appeals held that if the CPM is used to evaluate requests for time extensions it must reflect actual project conditions. In *Continental*, the contractor sought extra costs incurred due to suspensions of work and due to subsequent acceleration directed by the Government, claiming the Government's delay in approving shop drawings and in granting adequate time extensions delayed the project completion. The Government claimed that acceleration was justified, since the CPM revealed the project was behind schedule. The board rejected the Government's reliance on the CPM, stating that:

> It is essential that any changes in the work and time extensions due to the contractor be incorporated into the progress analysis concurrently with the performance of the changes or immediately after the delay and thus integrated into the periodic computer runs to reflect the effect on the critical path. Otherwise, the critical path chart produced by the computer will not reflect the current status of the work performed or the actual progress being attained.

*Continental Consolidated Corp., supra,* 67–2 BCA at 30,715. Thus, the board concluded that the critical path chart would show:

[T]he contractor to be behind schedule when in fact, if the appropriate time extensions were incorporated into the computer runs, the contractor might be well ahead of schedule on the critical path. *Id.* Since adequate time extensions were not granted immediately upon determining the extent of the delay, the board found that the CPM's completion schedule was distorted and unreliable as a basis for denying time extensions. *Id.*

In *J.A. Jones Constr. Co.*, ENG BCA Nos. 3035, 3222, 72–1 BCA ¶ 9261, the Army Corps of Engineers Board of Contract Appeals echoed its earlier concern that the CPM must reflect actual performance to be a reliable basis for evaluating requests for time extensions. In *J.A. Jones*, the contractor sought additional compensation for repairs to a cofferdam. The contract conditioned entitlement to compensation for repairs on the contractor's performance in accordance with the progress schedule approved by the contracting officer. The contracting officer denied compensation, since the CPM revealed the project was behind schedule. The board rejected the Government's reliance on the original, unadjusted CPM, stating that:

> The value and usefulness of the CPM * * * is dependent upon the Contracting Officer making prompt decisions when excusable delays are alleged by the contractor and upon the contractor promptly revising and updating the CPM chart to incorporate time extensions, whether they be tentative or finally determined, within a short time after occurrence of the delay.

*J.A. Jones Constr. Co., supra,* 72–1 BCA at 42,931. Since the CPM was not updated to incorporate recognized time extensions, the board found it "impossible to determine whether or not any particular work activity was or was not on schedule." *Id.* Accordingly, the Government's reliance on the CPM for denying the contractor additional time was improper.

Recently, in *Ballenger Corp.*, DOT BCA Nos. 74–32, 74–32A, 74–32H, 84–1 BCA

¶ 16,973, at 84,524, the Department of Transportation Board of Contract Appeals expressed its concern that the CPM's:

> [U]sefulness as a barometer for measuring time extensions and delay damages is necessarily circumscribed by the extent to which it is employed in an accurate and consistent manner to comport with the events actually occurring on the job. * * * *[T]his is the single most important factor in determining the acceptability of the [CPM] analysis.* [Emphasis added.]

At trial in the instant case, the Government took the position that Fortec was not entitled to *any* extensions of contract time or to *any* payment of extended overhead, since the CPM did not indicate that such relief was warranted. As a result, the Government failed to introduce evidence as to what, assuming Fortec was entitled to an extension of contract time and to payment of extended overhead, are the appropriate contract adjustments. Instead, the Government's litigating position was an all or nothing position.

After considering the evidence presented, this Court strongly disagrees with the Government's position that Fortec is neither entitled to any extension of contract time nor entitled to any payment of extended overhead. The facts are clear. The Government caused Fortec to suffer substantial delay in contract performance. Specifically, the Government admits that, as a result of Government actions, Fortec was unable to timely complete the hangar floor (frame and grate specifications defect), the roof (design change in the roof ventilator), and one entire wall of the hangar building (hangar doors specifications defect). In addition, Fortec was required to more than double the size of the valve pit in order to correct another design defect. As a result, this Court cannot conceive of how the Government can maintain that Fortec is not entitled to any additional extension of contract time and payment of extended overhead.

■ The Government's reliance upon the CPM in denying Fortec's claims is clearly

misplaced. While this Court recognizes that Fortec admittedly failed to justify its claimed relief by reference to the CPM, the Court cannot overlook the fact that neither party appears to have used the CPM in evaluating contract performance. Since Fortec's CPM was revised only once during performance, and then without regard to the effect of prior delay claims on the project not acknowledged by the Corps, its use after the fact as a gauge for measuring time extensions plainly is improper. Accordingly, Fortec is entitled to recover the amounts already discussed and allowed herein.

### H. Liquidated Damages

■■■ As a result of Fortec's delay in completion of the hangar project, the Corps assessed liquidated damages for the period July 7, 1979, through February 24, 1980, for a total of $31,455 (233 days at $135 per day). After carefully considering the evidence presented in this case, the Court believes that the Corps' assessment of liquidated damages was improper.

In *United States v. United Engineering and Contracting Co.*, 234 U.S. 236, 242, 34 S.Ct. 843, 845, 58 L.Ed. 1294 (1914), the United States Supreme Court held that:

> [W]hen the contractor has agreed to do a piece of work within a given time and the parties have stipulated a fixed sum as liquidated damages not wholly disproportionate to the loss for each day's delay, in order to enforce such payment the other party must not prevent the performance of the contract within the stipulated time, and that where such is the case, and thereafter the work is completed, though delayed by the fault of the contractor, *the rule of the original contract cannot be insisted upon, and liquidated damages measured thereby are waived.* [Emphasis added.]

To do otherwise, the Supreme Court reasoned "would permit it [the Government] to recover damages for delay caused by its own conduct." *Id.* *See also William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984); *Blinderman*

*Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982); *Prestex, Inc. v. United States*, 3 Cl.Ct. 373, 382 (1983); *Morris Mechanical Enterprises, Inc. v. United States*, 1 Cl.Ct. 50, 58, 554 F.Supp. 433, 441 (1982); *Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 366, 347 F.2d 509, 534–35 (1965); *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–15 (1944); *Schmoll v. United States*, 91 Ct.Cl. 1, 27–8 (1940); *National Radio Co.*, ASBCA No. 14707, 72-2 BCA ¶ 9486; *Minmar Builders, Inc.*, GSBCA No. 3430, 72-2 BCA ¶ 9599.

Here, the Corps has admitted that it contributed to the delay on the project. Specifically, (1) the Corps admits that it delayed Fortec in installing the roof ventilator; (2) the Corps admits that it erred in the design of the original valve pit; (3) the Corps acknowledges a design deficiency in the frame and grate, causing Fortec to delay work on the hangar trench; and (4) the Corps admits a delay in determining how to correct the deflection in the hangar doors. According to the above cited authorities, the Corps cannot assess liquidated damages against Fortec when the Corps contributed to the delay. Thus, even assuming that the causes of the delay were concurrent, as *admitted* by the Corps, rather than solely caused by the Corps as contended by Fortec, Fortec is nevertheless entitled to remission of all liquidated damages.

At trial, however, the Government, while arguing that the project delay was caused by Fortec rather than by the Corps' project modifications, failed to introduce *any specific evidence* that the delay in project completion was caused by Fortec. There was no proof that factors beyond the Corps' control significantly delayed the project, other than unusually severe weather. In fact, after reviewing all of the evidence, this Court is unable to find any proof that any of the delay was caused by Fortec, apart from the Government's allegations that its CPM analysis showed that Fortec was not entitled to a time extension for Government-caused delays.

In view of this Court's decision that the Corps improperly assessed Fortec liquidated damages, the issue of when the hangar project was substantially completed need not be addressed. While the Corps contends that the hangar project was not substantially completed until February 24, 1980, Fortec claims that the project was substantially completed on October 1, 1979. The effect of this Court finding that substantial completion occurred prior to February 24, 1980, would be to cut off the Corps' right to assess Fortec liquidated damages from such date of substantial completion. Since this Court has decided that the Corps cannot assess Fortec any liquidated damages, the date of substantial completion becomes moot.[5]

Accordingly, Fortec is entitled to recover $31,455, representing the amount withheld by the Corps as liquidated damages.

### I. Summary

Therefore, Fortec is entitled to recover the following in addition to any amounts previously paid by the Corps or to any additional time extensions previously allowed by the Corps:

A. On Fortec's claim for a time extension of fifty-seven calendar days due to unusually severe weather encountered between October 1, 1978, and June 23, 1979, this Court grants Fortec a one-day extension of contract time.

B. On Fortec's claim for additional compensation and for an extension of contract time resulting from Modification P006 (Valve Pit), Fortec is entitled to recover $5,274.97 and is entitled to a 14-day extension of contract time.

C. On Fortec's four claims resulting from Modification P009, Fortec is entitled to recover the following: (1) $82.69 for the removal of the septic tank and a one-day extension of contract time; (2) $8,739.41 for the trench frame and grate design defect and a 101-day extension of contract time; and (3) $4,898.61 for the hangar doors design defect and a 32-day extension of contract time. However, $646.92 will be deducted from the above amounts to reflect the deletion of removal of electric poles and wiring. Thus, Fortec is entitled to recover $13,073.79 and is entitled to a 134-day extension of contract time.

D. On Fortec's claim for a reduction in the amount withheld by the Corps under Modification P010 (Concrete Slabs), this Court will reduce the Government's credit from $3,630.94, the amount originally deducted for the defective concrete slabs, to $2,000. Thus, Fortec is entitled to recover $1,630.94.

E. On Fortec's claim for additional compensation and for an extension of contract time resulting from Modification P011 (Roof Ventilator), Fortec is entitled to recover $6,481.82 and is entitled to a 37-day extension of contract time.

F. On Fortec's subcontractor claims, Fortec is not entitled to recover any compensation or any extension of contract time.

G. On Fortec's claim for remission of liquidated damages assessed by the Corps, Fortec is entitled to recover $31,455, representing the entire amount of liquidated damages assessed.

### CONCLUSION

Accordingly, Fortec is entitled to recover $57,916.51, an extension of contract time of 186 days, interest as allowed by law, and costs of this action. Since 41 U.S.C. § 611 provides that the plaintiff is entitled to interest on the amounts awarded herein

---

**5.** While this Court need not determine the issue of when substantial completion occurred on the hangar project, it would find, after reviewing all of the evidence, that substantial completion occurred prior to January 1, 1980. Thus, even assuming that this Court has erred in ordering the Government to return all of the assessed liquidated damages to Fortec, the Government would still not be entitled to retain any liquidated damages. In its discussion above, this Court awarded Fortec a 186-day extension of contract time. Thus, Fortec would not have been liable for liquidated damages prior to January 9, 1980. Since this Court finds that substantial completion occurred prior to January 1, 1980, the Government was not entitled to assess any liquidated damages against Fortec for delay.

"from the date the contracting officer receives the claim pursuant to section 605(a) of this title from the contractor," entry of judgment will be deferred for thirty (30) days to allow the parties to stipulate to the dates the contracting officer received each of the plaintiff's claims. Upon the filing of such stipulation, the clerk shall enter judgment accordingly. If such stipulation cannot be agreed upon by the parties, the parties shall notify the Court that further proceedings are necessary on this issue.